## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

RONDA BERENS; DALTON KELLY;    :
DILARA BAUNACH; JANE DOE 1-4    :
    *Plaintiffs*    :
    :
    v.    :
    :
    :
YALE NEW HAVEN HEALTH    :
SERVICES CORPORATION    :
    *Defendant*    :    JULY 11, 2024

## **COMPLAINT AND DEMAND FOR TRIAL BY JURY**

### INTRODUCTION

1.    At all times relevant herein, the plaintiffs were health care workers employed by the defendant, Yale New Haven Health Services Corporation ("YNHHS").

2.    Beginning in October 2021, YNHHS required the plaintiffs to take an experimental gene therapy injection, colloquially referred to as a COVID-19 "vaccine," as a condition of their employment.

3.    However, at the time this policy went into effect, YNHHS knew that the "vaccine" did not prevent infection or transmission of COVID-19 because:

    (A)   The U.S. Food and Drug Administration ("FDA") had stated there was no evidence that the "vaccines" could prevent transmission of COVID-19;

    (B)   The Center for Disease Control and Prevention ("CDC") stated that the "vaccines" do not prevent infections or transmission of COVID-19; and

1

(C)   The Connecticut Department of Public Health ("CT DPH") issued a memorandum to all healthcare providers in state of Connecticut on February 23, 2021, admitting that the "vaccines" would not prevent infection and transmission of COVID-19.

4.     In addition to evidence demonstrating that the "vaccine" does not prevent infection or transmission of COVID-19, publicly available data from the FDA and CDC demonstrated that the COVID-19 injections are the most dangerous "vaccine" that has ever existed. Thus, YNHHS mandated the plaintiffs take a COVID-19 "vaccine" despite knowing that the potential harms from the drug greatly outweighed any potential benefit.

5.     In fact, scientific studies published while the YNHHS's policy was in effect demonstrated that the COVID-19 "vaccines" have a <u>negative efficacy</u> against the Omicron variant, which was the variant circulating in the United States at the time. Thus, YNHHS required the plaintiffs to take a COVID-19 "vaccine" even though the evidence demonstrated that the "vaccine" <u>increased</u> the likelihood of an individual contracting and spreading COVID-19.

6.     Even though YNHHS knew that requiring that the plaintiffs take a COVID-19 "vaccine" would provide no health benefit to any of its patients or employees, YNHHS did so anyway because YNHHS was acting in furtherance of a "public-private partnership" with the federal and State of Connecticut governments.

7.     Pursuant to this "public-private partnership," YNHHS implemented COVID-19 policies that were not based upon science or health in exchange for receiving hundreds of millions of dollars in public fund from the government; and in turn, the government would use the defendant's actions as pre-textual justification for implementing identical COVID-19 policies through unprecedented emergency powers.

8.      As a result of this "public-private partnership," YNHHS acted as an instrumentality of the government for the purpose of circumventing the Constitution to implement COVID-19 policies, and in doing so, violated the plaintiffs' constitutionally guaranteed right to bodily autonomy, medical privacy and equal protection.

9.      Accordingly, the plaintiffs bring this action pursuant to 42 U.S.C. §1983 to redress the egregious deprivation of their civil liberties committed by YNHHS.

## I.      PARTIES

10.     The defendant, Yale New Haven Health Services Corporation ("YNHHS"), is a Connecticut corporation, with a principal business location in New Haven, Connecticut.

11.     YNHHS is engaged in the business of providing medical services to the public and is licensed by the State of Connecticut to do so.

12.     The plaintiff, Ronda Berens, is an individual residing in Connecticut who was employed by YNHHS from February 19, 2018, until she was fired on October 18, 2021, for failing to comply with the defendant's COVID-19 "vaccine" policy, which is described with more specificity below.

13.     The plaintiff, Dalton Kelly, is an individual residing in Connecticut who was employed by YNHHS from May 1, 2017, until he was fired on October 19, 2021, for failing to comply with the defendant's COVID-19 "vaccine" policy, which is described with more specificity below.

14.     The plaintiff, Dilara Baunach, is an individual residing in Connecticut and at all relevant times to this lawsuit was employed by the defendant, YNHHS, until she was fired in March 2022.

15.     The plaintiff, Jane Doe 1, is an individual residing in Connecticut and at all relevant times to this lawsuit has been employed by the defendant, YNHHS. Because Jane Doe 1 is still currently employed by the defendant, she is commencing this action anonymously due to her real and imminent fear of retaliation by YNHHS and intends to file a motion for permission to proceed anonymously until disclosure of her identity is necessitated by discovery.

16.     The plaintiff, Jane Doe 2, is an individual residing in Connecticut and at all relevant times to this lawsuit has been employed by the defendant, YNHHS. Because Jane Doe 2 is still currently employed by the defendant, she is commencing this action anonymously due to her real and imminent fear of retaliation by YNHHS and intends to file a motion for permission to proceed anonymously until disclosure of her identity is necessitated by discovery.

17.     The plaintiff, Jane Doe 3, is an individual residing in Connecticut and at all relevant times to this lawsuit has been employed by the defendant, YNHHS. Because Jane Doe 3 is still currently employed by the defendant as a health care worker, she is commencing this action anonymously due to her real and imminent fear of retaliation by YNHHS and intends to file a motion for permission to proceed anonymously until disclosure of her identity is necessitated by discovery.

18.     The plaintiff, Jane Doe 4, is an individual residing in Connecticut and at all relevant times to this lawsuit has been employed by the defendant, YNHHS. Because Jane Doe 4 is still currently employed by the defendant as a health care worker, she is commencing this action anonymously due to her real and imminent fear of retaliation by YNHHS and intends to file a motion for permission to proceed anonymously until disclosure of her identity is necessitated by discovery.

4

## II.    <u>JURISDICTION AND VENUE</u>

19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(3) in that the controversy arises under the United States Constitution and under 42 U.S.C. §1983.

20.    This court has supplemental jurisdiction under 28 U.S.C. §1367(a) to hear and adjudicate state law claims.

21.    Venue is proper under 28 U.S.C. §1391 as the parties are residents of this judicial district and the acts or occurrences giving rise to these claims took place in Connecticut.

## III.    <u>BACKGROUND</u>

22.    On January 31, 2020, Secretary of Health and Human Services, Alex M. Azar, issued a Declaration of Public Health Emergency effective January 27, 2020. This declaration was renewed multiple times thereafter and was in effect at all times relevant herein.

23.    On March 10, 2020, Connecticut Governor, Edward Lamont formally declared a "public health emergency" due to COVID-19.[1] This emergency declaration was in effect until Governor Lamont allowed the declaration to expire on February 15, 2022.

24.    On March 13, 2020, President Trump issued a declaration of emergency due to COVID-19, which was renewed multiple times thereafter.

---

[1].   Governor Edward Lamont, Declaration of Emergency and Civil Preparedness, March 10, 2020, https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf

25.     On February 24, 2021, President Biden renewed and extended President Trump's March 13, 2020, declaration of emergency. This declaration was renewed multiple times thereafter and was in effect at all times relevant herein.

## A.  THE DEFENDANT'S VACCINE MANDATE

26.     On July 12, 2021, YNHHS issued notice to its employees, including the Plaintiffs, stating that, as a condition of their continued employment, they would be required to receive the single dose vaccine (Janssen/Johnson & Johnson) or the first dose of a two-dose vaccine (Pfizer or Moderna) by August 31, 2021, with a second dose of the Pfizer or Moderna to be received by September 30, 2021. And beginning on October 1, 2021, if an employee obtained a religious or medical exemption from receiving the COVID-19 "vaccine", the unvaccinated employee would be required to submit to weekly COVID-19 testing at an approved YNHHS testing location (the "Vaccine Mandate"). [2]

27.     The stated goal of YNHHS' Vaccine Mandate was to "pursue a 100 percent vaccination rate to minimize the risk of transmitting COVID-19." [3]

28.     At the time YNHHS notified the plaintiffs of its Mandate, Delta was the predominate variant of COVID-19 circulating amongst the population. [4]

---

[2].  Yale New Haven Healthcare Systems,  Covid Vaccination Required for YNHHS Employees medical staff and others, July 22, 2021, https://www.ynhh.org/publications/bulletin/072221/covid-vaccination-required-for-ynhhs-employees-medical-staff-and-others

[3].  Yale New Haven Healthcare Systems,  Covid Vaccination Required for YNHHS Employees medical staff and others, July 22, 2021, https://www.ynhh.org/publications/bulletin/072221/covid-vaccination-required-for-ynhhs-employees-medical-staff-and-others

[4].  CDC, COVID-19 Epidemiology during Delta Variant Dominance Period in 45 High-Income Countries, 2020-2021, https://wwwnc.cdc.gov/eid/article/29/9/23-0142_article

29.    On or about February 11, 2022, YNHHS gave notice to its employees that it was expanding its Vaccine Mandate to require that its employees, including the Plaintiffs, receive a booster dose of a COVID-19 "vaccine" by March 31, 2022, as a condition of employment (the "Booster Mandate").

30.    At the time YNHHS notified the plaintiffs of its Booster Mandate, Omicron was the predominant variant of COVID-19 circulating amongst the population.[5]

31.    After receiving notice of the Vaccine Mandate, the plaintiff, Ronda Berens, submitted a request for a medical exemption to YNHHS, together with a note from her primary care physician, which provided a detailed explanation of the medical reasons Ms. Berens was prevented from receiving the COVID "vaccine." YNHHS denied Ms. Berens medical exemption request. Ms. Berens then appealed this denial, but her appeal was denied as well. Ms. Berens was fired by the defendant on or about October 18, 2021, for refusing to be vaccinated against her will.

32.    After receiving notice of the Vaccine Mandate, the plaintiff, Dalton Kelly, submitted a request for a religious exemption to YNHHS, explaining why his religious beliefs and practices prevented him from receiving the COVID-19 "vaccine." YNHHS denied Mr. Kelly's religious exemption request and then was fired by the defendant on or about October 18, 2021, for refusing to be vaccinated against his will.

33.    The remaining plaintiffs were each granted an exemption from receiving a COVID-19 "vaccine," but pursuant to the defendant's policy, the plaintiffs were still required to submit to

---

[5]. CDC, Variant Proportions, http://covid.cdc.gov/covid-datatracker#variant-proportions

weekly COVID-19 testing at a YNHHS testing location, regardless of whether the employee was symptomatic or had acquired natural immunity to COVID-19.

**B.  THE PUBLIC-PRIVATE PARTNERSHIP**

34.    From the earliest days of the COVID-19 pandemic, YNHHS entered into what can be accurately described as a "public-private partnership" with the federal and State of Connecticut governments to implement COVID-19 policies.

35.    Pursuant to this "public-private partnership," the government agreed to pay YNHHS substantial amount of public funds in exchange for YNHHS implementing certain COVID-19 policies that the government was constitutionally precluded from implementing because the policies were not based in science, medicine or public health.

36.    The government would then use the fact that YNHHS had implemented these COVID-19 policies as pre-textual justification for the government to implement the same COVID-19 policies that it had paid YNHHS to implement.

37.    Thus, the "public-private partnership" benefitted both parties: The government used YNHHS as an instrumentality for circumventing the Constitution to implement COVID-19 policies it desired and YNHHS received substantial amounts of public funds from the government as consideration for implementing the policies even though they were not based in science, medicine or public health. In short, the government paid YNHHS to perform an end-run around the Constitution in furtherance of implementing COVID-19 policies that it desired.

38.    One example of this "public-private partnership" is that government paid YNNHS a substantial financial "bonus" for every COVID-19 hospital admission it reported to the government.[6]

39.    Per the U.S Department of Health and Human Services ("HHS") guidelines, YNHHS would be eligible to receive $76,975.00 per COVID-19 admission if YNHHS reported one hundred (100) or more COVID-19 admissions between January 1st and April 10th of 2020.[7]

40.    Per HHS guidelines, YNHHS was also eligible to receive $50,000.00 per COVID-19 admission during the second round of funding if YNHHS reported 161 COVID-19 admissions between January 1 and June 10, 2020, or one per day.[8]

41.    In doing so, the government created an massive financial incentive for YNNHS to maximize the number of positive COVID-19 hospital admissions it reported to the government.

42.    The government intentionally created this finical incentive to artificially inflate the number of positive COVID-19 cases reported and consequently distort the public's perception of the health threat that COVID-19 prosed to the public. For the government, the bigger the perceived threat that COVID-19 presented to the public, the more justification for the government to exercise unprecedented emergency powers in the name of fighting COVID-19.

---

[6].   American Hospital Association, Special Bulletin: Senate Passes the Coronavirus Aid, Relief, and Economic Security (CARES)  Act, Mar. 26, 2020, https://www.aha.org/special-bulletin/2020-03-26-senate-passes-coronavirus-aid-relief-and-economic-security-cares-act; Rodgers, Michelle, "Fact check: Hospitals get paid more if patients listed as COVID-19, on ventilators-Senator Scott Jensen video," USA TODAY, (Apr. 24, 2020), https://www.usatoday.com/story/news/factcheck/2020/04/24/fact-check-medicare-hospitals-paid-more-covid-19-patients-coronavirus/3000638001/
[7].   U.S. Dept. of Health and Human Services, HHS to begin distributing $10 Billion to Hospitals in High Impact COVID-19 Areas,  https://www.hhs.gov/about/news/2020/07/17/hhs-begin-distributing-10-billion-additional-funding-hospitals-high-impact-covid-19-areas.html
[8].   *Id.*

43.     YNHHS ultimately received a total of $111,911,226.07 from the government for COVID-19 admissions that it reported to public health authorities.[9]

44.     Another of example of this "public-private partnership" is that on or about May 21, 2020, YNHHS entered into an agreement with the State of Connecticut whereby YNHHS agreed to administer ten thousand (10,000) COVID-19 PCR (polymerase chain reaction) tests on its asymptomatic employees by June 30, 2020, in exchange for receiving substantial amounts of public funds from the government that YNHHS considered to be "critically important."

45.     In furtherance of this agreement, YNHHS implemented a mandatory COVID-19 testing policy for all of its employees regardless of whether the employee was symptomatic or asymptomatic.

46.     However, as a health care provider, YNHHS knew at that time it implemented this mandatory asymptomatic COVID-19 testing policy that the policy was not based in science or public health because it had already been determined that asymptomatic transmission of COVID-19 was effectively non-existent.[10]

47.     Because of this agreement with the government, YNHHS was able to charge upwards of Seven Hundred Dollars ($700.00) for every COVID-19 test performed at a YNHHS testing site

---

[9].  CDC, Provider Relief Fund COVID-19  High Impact Payments, https://data.cdc.gov/Administrative/Provider-Relief-Fund-COVID-19-High-Impact-Payments/b58h-s9zx/data (YNNHS received $59,728,984.00 for first round of funding and $52,182,237.00 in the second round of funding.)

[10].  Kupferschmidt, Kai, Study claiming new coronavirus can be transmitted by people without symptoms was flawed, *Science*, Feb. 3, 2020,  https://www.sciencemag.org/news/2020/02/paper-non-symptomatic-patient-transmitting-coronavirus-wrong; See also, US Dept. HHS, "Update on the New Coronavirus Outbreak First Identified in Wuhan, China, (Jan. 28, 2020, at 00:44:12) available at *YouTube,* http://www.youtube.com/watch?v=w6koHkBCoNQ&t=2605s

and receive payment of the full amount it charged, resulting in a huge financial windfall to YNHHS.

48.     Not coincidentally, at about the same time YNHHS implemented its mandatory COVID-19 testing policy, the State of Connecticut signed a no-bid contract with the company Sema4 to coordinate COVID-19 testing in Connecticut. Sema4 is owned by a hedge fund managed by Governor Lamont's wife, Ann Lamont.[11]  Accordingly, Governor Lamont had a personal financial incentive to maximize the amount of COVID-19 testing performed in the State of Connecticut and maximize the financial remuneration received for performing said tests.

49.     On or about June 18, 2020, at the behest of Governor Lamont, YNHHS entered into another agreement with the State of Connecticut to administer ten thousand (10,000) COVID-19 tests per day until August 1, 2020, in exchange for receiving substantial remuneration for performing said COVID-19 tests.

50.     As a result of the agreements described above, YNHHS received substantial amounts of money for COVID-19 tests taken by its employees, including the plaintiffs.

51.     YNHHS continued to receive substantial financial remuneration for the COVID-19 tests taken by its employees, including the Plaintiffs, were required to perform in connection with its Vaccine and Booster Mandates.

---

[11].   Mahoney, Edmund H., Family investments, coronavirus pandemic put Governor Lamont on an ethical tightrope, Hartford Courant, June 14, 2020, https://www.courant.com/coronavirus/hc-news-coronavirus-lab-testing-contracts-20200611-20200614-mjmjsjir4jdsji3s7b562h4qmy-story.html

### C.  THE VACCINE MANDATE WAS PART OF DEFENDANT'S PUBLIC-PRIVATE PARTNERSHIP WITH THE GOVERNMENT

52.    When YNHHS implemented its Vaccine Mandate, it was acting in furtherance of its "public-private partnership" with the government.

53.    One of the Defendant's motivations for instituting this policy was to affect government policies related to COVID-19 "vaccines."[12]

54.    On August 19, 2021, Governor Lamont cited the COVID-19 "vaccine" policies instituted by health providers, such as the defendant, as part of his justification for using emergency powers to implement an identical COVID-19 "vaccine" policy through executive order.[13]

55.    That YNHHS instituted its mandatory COVID-19 "vaccination" policy in furtherance of its "public-private partnership" with the government is further evidenced by the fact that the policies were ended once the financial incentives created by the government were removed.

56.    For example, YNHHS arbitrarily ended its mandatory COVID-19 testing policy, including the mandatory testing policy that was tied into its Vaccine and Booster Mandates, once the government created financial incentives to maximize the number of COVID-19 tests performed were rolled back.[14]

---

[12].   Kristofferson, Matt, Yale's New Vaccine Initiative Targeting COVID-19, Yale School of Medicine, Jan. 25, 2021, https://medicine.yale.edu/news-article/yales-new-vaccine-initiative-targeting-covid-19/

[13].   Gov. Lamont, Protection of Public Health and Safety During COVID-19 Pandemic-Vaccinations Required For State Employees, School Employees and Childcare Facility Staff, Executive Order No. 13D (Aug. 19, 2021), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-13D.pdf

[14].   David Brown and Andrew Altimari, Audit: CT Officials don't know if Covid testing providers were overpaid, *Connecticut Public*, Oct. 20, 2022, https://www.ctpublic.org/news/2022-10-20/audit-ct-officials-dont-know-if-covid-testing-providers-were-overpaid

57.     On or about July 6, 2022, YNHHS stated that it was officially continuing its COVID-19 PCR testing policy for its unvaccinated employees unless and until the COVID-19 infection positivity rate fell below one (1%) percent.

58.     Yet, on August 1, 2022, YNHHS arbitrarily ended its mandatory testing policy for its unvaccinated employees even though its infection positivity rate was at approximately eleven percent (11%), significantly higher than the one percent (1%) threshold it had previously set.

59.     Then, during an employee "town hall" meeting on August 17, 2022, YNHHS discouraged its employees from performing asymptomatic COVID-19 testing for the first time.

60.     The cessation of the mandatory testing policies by YNHHS was not based upon any scientific, medical or public health consideration, but rather was entirely based upon financial considerations, namely that YNHHS would no longer receive funding from the government in connection with COVID-19 testing.

61.     Similarly, on or about January 20, 2022, Governor Lamont announced that the vaccine mandate he instituted by executive order would end on February 15, 2022, when he allowed his COVID-19 public health emergency declaration to expire. [15]

62.     Not coincidentally, Sema4's contract with the State of Connecticut to perform COVID-19 testing ended on January 15, 2022, after details of the contractual relationship and conflicts of interest became widely reported.[16]

---

[15].   Keating, Christopher, Connecticut Legislature expecting Gov. Lamont's emergency powers to expire, *Hartford Courant*, Jan. 24, 2022, https://www.courant.com/politics/hc-pol-legislature-lamont-no-powers-extension-20220124-7qrqadq3encojc7x6v2c2h2ahy-story.html

[16].   Altimari, Dave and Phillips, Erica E., Sema4 pulls out of COVID-19 testing contract with Connecticut, *Hartford Courant*, Dec. 17, 2021, https://www.courant.com/politics/hc-pol-covid-testing-sema4-pulls-out-20211217-n2aar7ub7vfhle3w7qulfkbjci-story.html

63.    The foregoing demonstrates that the Defendant's COVID-19 policies were wholly driven by revenues garnered from its "public-private partnership" with the government, not science or public health.

### D. THE COVID-19 INJECTIONS ARE NOT VACCINES

64.    Traditionally a vaccine has always been defined as an injection of an attenuated (i.e. weakened) strain of a virus which allows the body's immune system to learn how to fight the virus to prevent future infection and transmission of the targeted disease.[17]

65.    The COVID-19 "vaccine," however, utilizes a novel mRNA technology—which is classified as a gene therapy—that has never been used in any previous vaccine distributed to the public. The mRNA technology in the COVID-19 "vaccine" sends genetic coding information to a person's cells which instructs the ribosome to create the "spike protein" of the original (i.e. Wuhan or wild type) strain of the SARS-CoV-2 virus.[18] Simultaneously, adjuvants in the vaccine stimulate the body's immune system so that the immune system attacks the "spike proteins" which were created by body's ribosomes. This process specifically programs the individual's immune system

---

[17] .  Flint, Jane, et al., PRINCIPLES OF VIROLOGY, VOL. 1: MOLECULAR BIOLOGY (Kindle, 5th Edition 2020), ASM Press, pp. 9, 562

[18].    CDC, Understanding How COVID-19 Vaccines Work, *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/how-they-work.html *;see also*, Seneff (2021), Worse Than the Disease? Reviewing Some Possible Unintended Consequences of the mRNA Vaccines Against COVID-19, *International Journal of Vaccine Theory, Practice and Research* 2(1), May 10, 2021, pp. 42- 43, *available at* https://dpbh.nv.gov/uploadedFiles/dpbhnvgov/content/Boards/BOH/Meetings/2021/SENEFF~1. PDF (mRNA is encoding information, naturally created by the human body in the process of cell replication and production, which instructs the ribosome to produce certain proteins); Flint, Jane, et al., PRINCIPLES OF VIROLOGY, VOL. 1: MOLECULAR BIOLOGY (Kindle, 5th Edition 2020), ASM Press, pp. 3,19,21.

to recognize the "spike protein" of the (i.e. Wuhan or wild type) strain of the SARS-CoV-2 virus when is encountered in the future. [19]

66.    Because the COVID-19 "vaccines" utilize this experimental mRNA technology, neither Pfizer nor Modera describe their products as "vaccines" in official filings with the U.S. Securities and Exchange Commission. Rather, both Pfizer and Moderna describe their products as a "gene therapy."[20] [21]

67.    The FDA does not classify the COVID-19 injections as a "vaccine." Instead, the FDA classifies them as "CBER-Regulated Biologics," otherwise known as "therapeutics," which falls under the "Coronavirus Treatment Acceleration Program."[22]

68.    However, notwithstanding the technical classifications, it axiomatic that the so called "vaccines" are misnamed because, as described below, they do not prevent infection or transmission of the disease, the key elements of a true vaccine.

### E.    THE "VACCINES" DO NOT PREVENT INFECTION OR TRANSMISSION OF COVID-19

---

[19]   Seneff, Worse Than the Disease? Reviewing Some Possible Unintended Consequences of the mRNA Vaccines Against COVID-19, *International Journal of Vaccine Theory, Practice and Research* 2(1), May 10, 2021, at pp. 42-43, 47-48, *available at* https://dpbh.nv.gov/uploadedFiles/dpbhnvgov/content/Boards/BOH/Meetings/2021/SENEFF~1.PDF

[20]   *Moderna, Inc.,* United States Securities and Exchange Commission, Form 10-Q, Quarterly Report Pursuant to Section 13 or 15(D) of the Securities Exchange Act of 1934 (for the quarterly period ended June 30, 2020),
https://www.sec.gov/Achieves/edgar/data/182852/000168285220000017mrna-20200630.htm

[21]   *BioNTech SE,* United States Securities and Exchange Commission, Form F-1 Registration State, filed Sept. 9, 2019,
https://www.sec.gov/Archives/edgar/data/1776985/000119312519241112/d635330df1.htm

[22]   FDA, *Coronavirus (COVID-19) CBER-Regulated Biologics,* https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics ; *See also*, FDA, *Coronavirus Treatment Acceleration Program (CTAP),*
https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap

69.    When the FDA first granted emergency use authorization ("EUA") for the COVID-19 "vaccine" on December10, 2021, the FDA admitted that it did not have any evidence that the "vaccines" prevented transmission of COVID-19 because the necessary testing had never been done.[23]

70.    In connection with granting EUA for the COVID-19 "vaccine" on December 10, 2020, the FDA published the Phase 3 clinical trial data that the FDA relied upon in making this decision. This data demonstrated that the absolute risk reduction provided by the "vaccine" was only .84%. In other words, the so called COVID-19 "vaccines" demonstrated an absolute risk reduction of less than 1%.[24]

71.    The FDA's official position is that claims about vaccine efficacy should be stated in terms of absolute risk reduction, rather than comparative risk reduction, because statements about comparative risk reduction can be misleading to the public.[25]

72.    In fact, the State of Kansas cited the foregoing as part of its civil lawsuit filed against Pfizer on June 17, 2024, for violating Kansas' consumer protection laws.[26]

73.    Therefore, as a licensed medical provider, YNHHS knew that the drug manufacturers' claim that the COVID-19 "vaccine" was "95% effective,"[27] was intentionally

---

[23].  FDA, Comirnaty and Pfizer-Biontech Vaccines, Memorandum Decision (Dec. 11, 2020), p. 49, https://www.fda.gov/media/144416/download

[24].  FDA, Comirnaty and Pfizer-Biontech Vaccines, Memorandum Decision (Dec. 11, 2020), p. 23, https://www.fda.gov/media/144416/download

[25].  FDA, Fischhoff, *Communicating Risks and Benefits: An Evidence Based User's Guide* (2011), at pp. 59-60, https://www.fda.gov/media/81597/download

[26].  *State of Kansas, ex rel v. Pfizer, Inc*., Compl. at p. 37, available at https://ag.ks.gov/docs/default-source/documents/2024-06-15-pfizer-complaint-(002).pdf

[27].  *See e.g.*, Fox, Maggie, et al., Pfizer and BioNTech say final analysis shows coronavirus vaccine is 95% effective with no safety concerns, *CNN* (Nov. 18, 2020),

misleading because it was based upon comparative risk reduction rather than absolute risk reduction.

74.    On February 23, 2021, the Connecticut Department of Public Health ("CT DPH") issued a memorandum to all health care providers in Connecticut, including YNHHS, admitting that the "vaccines" would not prevent infection and transmission of COVID-19 and therefore, health care providers should be prepared for "breakthrough cases" – the term used to identify individuals who test positive for COVID-19 after being "fully vaccinated." [28]

75.    As a licensed health care provider in Connecticut, YNHHS received a copy of the February 23, 2021, CT DPH Memorandum, and therefore knew that the "vaccine" could not prevent infection or transmission of COVID-19 no later than February 23, 2021.

76.    When the FDA subsequently issued extended the EUA for the COVID-19 vaccine on May 10, 2021, the FDA again admitted there was no evidence that the "vaccine" prevented transmission of COVID-19. [29]

77.    By July 2021, "breakthrough infections" of COVID-19 had become so prevalent that the CDC was forced to publicly admit that the "vaccines" do not stop infection or transmission of COVID-19.[30]

---

https://www.cnn.com/2020/11/18/health/pfizer-coronavirus-vaccine-safety/index.html; Lovelace Jr., Berkley,  Pfizer says final data analysis shows Covid vaccine is 95% effective, plans to submit to FDA in days, *CNBC* (Nov. 18, 2020), https://www.cnbc.com/2020/11/18/coronavirus-pfizer-vaccine-is-95percent-effective-plans-to-submit-to-fda-in-days.html
[28].   CT DPH, COVID-19 Breakthrough Recommendations (Feb. 23, 2021), https://portal.ct.gov/-/media/DPH/HAI/COVID19-Vaccine-Breakthrough-Recommendations.pdf
[29].   FDA, Comirnaty and Pfizer-Biontech Vaccines, Memorandum Decision (May 10, 2021), p. 38, https://www.fda.gov/media/148542/download
[30].   CDC, Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021, https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm

78.    In July 2021, CDC director Rochelle Wilensky admitted that "Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus."[31]

79.    Therefore, as a licensed medical provider in Connecticut, when YNHHS mandated the Plaintiffs take a COVID-19 vaccine as a condition of their employment, YNHHS knew that the "vaccine" could not prevent infection or transmission of COVID-19, yet implemented and enforced the Mandate anyway.

80.    Even before the FDA granted EUA to the COVID "vaccine," research funded by the National Institute of Health (NIH) and published in November of 2020, warned that the COVID-19 "vaccines" would not provide immunity to COVID-19, and therefore, the "vaccines" would not prevent infection or transmission of COVID-19.[32]

81.    Another study funded by the National Institutes of Allergy and Infectious Diseases (NIAID) and published on April 8, 2021, found that the antibodies produced by the COVID-19 "vaccines" would lose their ability to provide protection against future variants of the virus emerging after the original strain of COVID-19.[33]

---

[31].  Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html
[32].  Kennedy, David, Read, Andrew, Monitor for COVID-19 Vaccine Resistance Evolution During Clinical Trials, *PLOS Biology*, Nov. 9, 2020, available at https://doi.org/10.1371/journal.pbio.3001000
[33].  Eguia, Rachel, et al. (2021), A Human Coronavirus Evolves Antigenically to Escape Antibody Immunity, *PLOS Pathogens* (April 8, 2021), https://pubmed.ncbi.nlm.nih.gov/33831132/

82.     On September 1, 2021, the CDC quietly changed the definition of "vaccine" so that it no longer required providing immunity to the infectious disease targeted by the drug.[34]

83.     Prior to September 1, 2021, the CDC defined a "vaccine" as: "A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease.[35]

84.     On September 1, 2021, the CDC changed the definition of "vaccine" to: "A preparation that is used to stimulate the body's immune response against diseases."[36]

85.     On September 22, 2021, in connection with the FDA granting EUA for a third "booster" dose of the COVID-19 "vaccine," the FDA admitted that that the antibodies produced in response to the "vaccine" quickly disappear so that the "vaccine" did not provided protection against the Delta variant, or subsequent variants such as Omicron.[37]

86.     Once the Omicron variant became the dominant strain of COVID-19 circulating in the United States by November 2021, the CDC recognized that the "vaccines" do not prevent infection or transmission of COVID-19, just as they did not prevent infection or transmission of the Delta variant. The CDC's website addressing the Omicron variant states: "*CDC expects that*

---

[34]. The CDC defines "Immunity" as, "Protection from an infectious disease. If you are immune to a disease, you can be exposed to it without becoming infected."
[35]. FDA, Vaccine Basics (Aug. 26, 2021), https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm
[36]. FDA, Vaccine Basics (September 2, 2021), https://web.archive.org/web/20210902194040/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm
[37]. FDA, Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum, (Sept. 22, 2021), https://www.fda.gov/media/152432/download

*anyone with Omicron infection can spread the virus to others, even if they are vaccinated or don't have symptoms*."[38]

87.    On December 15, 2021, Dr. Anthony Fauci admitted that the COVID-19 "vaccines" do not stop infection and transmission of COVID-19 in an article published in the *New England Journal of Medicine,* writing that: "Vaccination has also been unable to prevent 'breakthrough' infection, allowing subsequent transmission to other people…"[39]

88.    As a result, while the Defendant's Vaccine Mandate was in effect and long before the Defendant issued its Booster Mandate, the CDC did not claim that the "vaccine" prevented infection or transmission of COVID-19, but rather that the "vaccine" reduced the symptoms of the disease. In other words, CDC was admitting that the COVID-19 "vaccines" were, at best, no more than a treatment or therapeutic.

89.    The foregoing unequivocally demonstrates that, as a licensed medical provider in Connecticut, YNHHS knew that the "vaccine" would not prevent infection or transmission of COVID-19 at the time it implemented its Vaccine Mandate and Booster Mandate yet did so anyway because YNHHS was acting in furtherance of its "public-private partnership" with the government.

### F.    THE COVID-19 "VACCINES" HAVE NEGATIVE EFFICACY

90.    While the Defendant's Mandate was in effect, and before YNHHS issued its Booster Mandate, scientific studies demonstrated that the antibodies produced by the COVID-19 "vaccine"

---

[38].   CDC, Omicron Variant: What you Need to Know, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html

[39].   Fauci, Anthony, et al. (2021), Universal Coronavirus Vaccines—An Urgent Need, *The New England Journal of Medicine* (Dec. 15, 2021), https://www.nejm.org/doi/full/10.1056/NEJMp2118468

rapidly disappear and will quickly result in the efficacy of the "vaccine" turning negative, meaning that individuals who are vaccinated become more likely to contract COVID-19 than individuals who did not receive the "vaccine."

91.    For example, when the FDA approved a third "booster" dose of the COVID "vaccine" in August of 2021, the FDA admitted that there was no evidence that the third "booster" dose provided any additional protection from infection of COVID-19.[40]

92.    Independent studies also concluded that the efficacy of the COVID-19 "vaccines" will quickly turn negative, meaning that the Defendant's vaccinated employees would be more likely to contract and spread COVID-19 than its unvaccinated employees.

93.    For example, in September 2021, scientists from Harvard University published a meta-analysis study investigating the relationship between the percentage of a population fully vaccinated and new COVID-19 cases across 68 countries and across 2947 counties in the U.S. found that there is "no discernable relationship between population fully vaccinated and new COVID-19 cases…." In fact, the only correlation between vaccination rates and COVID-19 cases that the study found was that "countries with a higher percentage of population fully vaccinated have higher COVID-19 cases per [capita]." In other words, by September 30, 2021, data from around the world demonstrated that countries which have the highest percentage of their population vaccinated will have the most COVID-19 cases.[41]

---

[40].    FDA, Decision Memorandum, Emergency Use Authorization (EUA) for Moderna COVID-19 Vaccine (Aug. 12, 2021), https://www.fda.gov/media/151611/download
[41].    Subramanian & Kumar (2021), Increases in COVID-19 are unrelated to levels of vaccination across 68 Countries and 2947 Counties in the United States, *European Journal of Epidemiology* (Sept. 30, 2021), available at https://doi.org/10.1007/s10654-021-00808-7

94.    Another study published in December 2021 demonstrated that the "vaccines" have negative efficacy against the Omicron so that people who were vaccinated were more likely to contract COVID-19 than those who were unvaccinated.[42]

95.    The foregoing perfectly explains why COVID-19 cases exploded in Connecticut during the time the Defendant's Vaccine Mandate was in effect, as illustrated by the graph below of all COVID-19 cases in Connecticut between March 25, 2020, and January 7, 2022.[43]



96.    Thus, at the time when YNHHS issued its Booster Mandate, it was widely known that the efficacy of the COVID-19 "vaccine" becomes negative when confronted with the

---

[42].  Hansen, et al. (2021), Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT162b2 or mRNA-1273 vaccination series: A Danish cohort Study (Dec. 20, 2021), *medRxiv* preprint, available at https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v2

[43].  CT DPH, COVID-19 Tests, Cases Hospitalizations, and Deaths, https://data.ct.gov/Health-and-Human-Services/COVID-19-Tests-Cases-Hospitalizations-and-Deaths-S/rf3k-f8fg

"Omicron" variant, which was the predominate variant circulating in the population at the time YNHHS issued its Booster Mandate. Yet, YNHHS implemented and enforced its Booster Mandate despite knowing that there was no evidence that it provided any medical or public health benefit, and that it would actually increase the chances its vaccinated employees contracted and spread COVID-19 because it was acting in furtherance of its "public-private partnership" with the government.

### G.    THE COVID-19 VACCINES ARE DANGEROUS

97.    Prior to YNHHS implementing its Vaccine Mandate, Pfizer published a six month update of its Phase 3 trial, also reproduced in *The New England Journal of Medicine,* which revealed significant red flags concerning the safety of its COVID-19 vaccines. For example, there were 5,241 related adverse events reported in the vaccine arm of the trial compared to 1,311 such events reported in the placebo group (+300%); 262 severe adverse events in the vaccine cohort compared to 150 such events in the placebo group (+75%); and 127 serious adverse events (defined as ER or hospitalizations) in the vaccine arm compared to 116 events in the placebo arm (+10%).[44]

98.    In May of 2021, the FDA issued a Review Memorandum analyzing data from Pfizer's Phase 3 clinical trial which the FDA relied upon in deciding whether Pfizer's COVID-19 "vaccine" should be granted licensure. This clinical trial data evidenced that there were more deaths among individuals who received the vaccine (21) than those who received the placebo (17). In other

---

[44].  Thomas, Stephen, et al. (2021), Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine Through 6 Months, *The New England Journal of Medicine* (Sept. 15, 2021), https://pubmed.ncbi.nlm.nih.gov/34525277/, Supp. Appendix, Table S3, https://www.nejm.org/doi/suppl/10.1056/NEJMoa2110345/suppl_file/nejmoa2110345_appendix .pdf

words, more people died in the group of test subjects that received the "vaccine" than in the cohort who received a placebo.[45]

99.    As part of the 1990 Public Readiness and Emergency Preparedness Act, the Vaccine Adverse Event Reporting System (VAERS) was created to receive reports about suspected adverse events that maybe associated with vaccines, VAERS is intended to serve as an early warning system for safety issues.

100.    It has been well established, since well before COVID-19, that adverse events are significantly underreported.[46]

101.    The VAERS data available while the Vaccine Mandate was in effect reveals unprecedented levels of deaths and other adverse events since the FDA issued Emergency Use Authorizations (EUAs) for the COVID-19 "vaccines." By December 31, 2021, there were a total of 21,382 deaths associated with the COVID-19 "vaccines." In the entire thirty-year history of VAERS prior to the rollout of the COVID-19 "vaccines," there were a total of 9,254 deaths reported to VAERS for all other vaccines combine. This disparity is illustrated in the graph below.[47]

---

[45].  FDA, BLA Clinical Review Memorandum (May 18, 2021), p. 23 https://www.fda.gov/media/152256/download
[46].  Lazarus, Ross et al. Grant ID: R18 HS 017045. *Electronic Support for Public Health-Vaccine Adverse Event Reporting System (ESP: VAERS).* Submitted to The Agency for Healthcare Research and Quality (AHRQ).
[47].   VAERS Vaccine Adverse Event Reporting System data, available at https://vaers.hhs.gov ; https://openvaers.com



102.    Therefore, as a licensed medical provider, YNHHS knew that the COVID-19 vaccines were not safe at the time it implemented its Vaccine Mandate.

## COUNT ONE

## VIOLATION OF SUBSTANTIVE DUE PROCESS AND CIVIL LIBERTIES – 42 U.S.C. §1983

103.    The Supreme Court of the United States has recognized that "no right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment." See e.g., *Cruzan by Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) (citing *Union Pacific R. Co. v. Botsford,* 141 U.S. 250, 251 (1891)).

104.    The U.S. Supreme Court has also recognized that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty interest. *Washington v. Harper*, 494 U.S. 210, 229 (1990).

105.    Thus, a competent person has a liberty interest under the Due Process Clause to the Constitution, which includes the rights of personal autonomy, bodily integrity, informed consent and refusing unwanted medical treatment. *Cruzan by Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990).

106.    Under *Jacobson v Massachusetts,* 197 U.S. 11 (1905), the Supreme Court held that the State may only use its police powers to mandate individuals take a vaccine, if the vaccine prevents infection and transmission of a disease because the state action will have a real and substantial relation to protecting the public health. In other words, if a vaccine prevents infection and transmission of the targeted disease, a vaccine mandate is permissible because the state's interest in protecting the public health outweighs the individual's liberty interest in bodily autonomy; but if a vaccine does not prevent infection or transmission of the targeted disease, it does not protect the public health so the individual's liberty interest in refusing unwanted medical treatment outweighs any state's interest in mandating the vaccine. *Health Freedom Def. Fund, Inc. v. Carvalho,* Slip Op. No. 22-55908, at p. 18 (9th Cir. June 7th, 2024).

107.    At the time YNNHS instituted and enforced its Vaccine Mandate and subsequent Booster Mandate, YNNHS knew:

- The "vaccine" does not prevent infection of COVID-19

- The "vaccine" does not prevent transmission of COVID-19

- The efficacy of the "vaccine" quickly turns negative which makes vaccinated individuals more likely to contract and spread COVID-19 than unvaccinated individuals

- The COVID-19 "vaccines" are the most dangerous vaccines ever administered to the public.

108.    Thus, at the time YNNHS instituted and enforced its Vaccine Mandate and subsequent Booster Mandate, YNNHS knew there was no plausible scientific, medical, or public health rationale for requiring the Plaintiffs take a COVID-19 "vaccine" or submit to weekly testing.

109.    Despite this knowledge, YNHHS instituted and enforced its Vaccine Mandate and subsequent Booster Mandate because it was acting pursuant to its "public-private partnership" with federal and Connecticut State governments. In other words, YNHHS was acting as an instrumentality of the government so that it could receive windfall financial remuneration.

110.    Therefore, YNHHS's knew when it instituted and enforced its Mandate and subsequent Booster Mandate, that it was violating the Plaintiffs' right to bodily autonomy guaranteed under the United States Constitution.

111.    As a direct result and consequence of YNHHS violating the Plaintiffs' constitutional rights, the plaintiffs have suffered damages.

112.    42 U.S.C. §1983 creates a private cause of action for individuals to remedy constitutional violations of civil rights. *Carey v. Piphus*, 435 U.S. 247, 253 (1978).

113.    'Private persons, jointly engaged with state officials in violating a plaintiff's constitutional rights, are acting 'under color' and can be held liable under §1983. In other words, to act 'under color' of law does not require that the accused be an officer of the State. It is enough

that he is a willful participant in joint activity with the State or its agents. *Adickes v. Kress Company*, 398 U.S. 144, 152 (1970) (citing *Monroe v. Pape*, 365 U.S. 167, (1961).

114.    Because YNHHS was acting in furtherance of "public-private partnership" with the government in implementing and enforcing its Vaccine and Booster Mandates, YNHHS may be held liable for violating the plaintiffs' constitutional rights

115.    The plaintiffs bring a claim under 42 U.S.C. §1983 to remedy the violations of their constitutional rights.

### COUNT TWO

### VIOLATION OF EQUAL PROTECTION
### UNDER FOURTEENTH AMENDMENT – 42 U.S.C. §1983

1-115.  Paragraphs 1 through 115 are incorporated by reference as if fully alleged herein.

116.    The Equal Protection Clause of the Fourteenth Amendment prohibits classifications that affect some groups of citizens differently than others. *Engquist v. Or. Dept. of Agric.,* 553 U.S. 591, 601 (2008).

117.    The Equal Protection Clause of the Fourteenth Amendment "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293 (1997).

118.    If a law neither burdens a fundamental right nor targets a suspect class, the policy violates the Equal Protection Clause if there is not a rational relationship between the disparity of treatment and some legitimate purpose. *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620 (1996).

119.    The defendant's Vaccine and Booster Mandates created two different classes of employees solely based upon whether the employee received a COVID-19 "vaccine," or not.

28

120.    The Vaccine and Booster Mandates treated each class differently solely based upon whether the individual received a COVID-19 "vaccine:" The Mandates imposed an additional burden on the unvaccinated plaintiffs by requiring they take a weekly COVID-19 test regardless of whether the individual was manifesting symptoms of COVID-19 or had acquired natural immunity, while their vaccinated co-workers were exempted from this testing obligation.

121.    Because the "vaccine" does not prevent infection or transmission of COVID-19, and therefore people who received the COVID-19 "vaccine" are, at best, equally as likely to contract and spread COVID-19 as those individuals who did not take the "vaccine," there is no plausible scientific, medical rational for YNHHS requiring that only the unvaccinated plaintiffs take a weekly COVID-19 test.

122.    Consequently, YNHHS knew that the mandatory testing provision of the Vaccine and Booster Mandates had no basis in science or medicine because it required only the unvaccinated plaintiffs to submit to mandatory weekly COVID-19 testing even though the defendant's vaccinated employees were as likely, in not more likely, to contract and spread COVID-19. Rather, the purpose of the mandatory testing provision was to punish and coerce the plaintiffs into taking a COVID-19 "vaccine" against their will in furtherance of its "public-private partnership" with the government.

123.    Therefore, the defendant's Vaccine and Booster Mandates arbitrarily and capriciously required that only the unvaccinated plaintiffs take a weekly COVID-19 test, and in doing so, violated the plaintiffs' right to equal protection under the Fourteenth Amendment.

124.    Accordingly, the plaintiffs bring a claim under 42 U.S.C. §1983 to remedy the violations of their constitutional rights.

WHEREFORE, the Plaintiff prays for the following relief:

1.    Monetary damages;

2.    Attorney's Fees

4.    Costs;

5.    Such other relief as equity may pertain.


THE PLAINTIFFS


By:___/s/ *Matthew S. Carlone*___
    Matthew S. Carlone
    Terk & Carlone, LLC
    81 Wolcott Hill Road
    Wethersfield, CT 06109
    Fed. Bar No. CT9094
    Juris No. 432761
    MCarlone@Terkcarlone.com

## Certification of Service

I hereby certify that on July 11, 2024, a copy of the foregoing Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By:_____/s/_____
   Matthew S. Carlone
   Terk & Carlone, LLC
   81 Wolcott Hill Road
   Wethersfield, CT 06109
   Fed. Bar No. CT9094
   Juris No. 432761
   MCarlone@Terkcarlone.com